and case number 24562, United States v. Watts. Good morning, your honors. My name is Joe Ryan. I'm the CJA lawyer for Mr. Watts, and we're here for the second time before this court concerning this sentence. Judge Seibert's first sentence was a year and a day. And this court said that that was too lenient, and that he should be resentencing. At the resentence hearing, of course, an event happened that nobody contemplated. A cerebral vascular stroke hit Mr. Watts. As I understand, a cerebral vascular stroke is the heart doesn't function, the air doesn't get to the brain, the eye, which needs oxygen. Houston Medical Center treated Mr. Watts for a year, and that was documented in 775 pages of medical records. The probation department examined the records, interviewed Mr. Watts, and came to the conclusion that any jail would be excessive given his medical condition. There was no evidence to contradict that opinion. That was an opinion. It was. That's not evidence. It was an opinion based upon documented medical evidence. The judge rejected that, but not for a contrary opinion on medical evidence. The judge rejected it because it was the sentences of other defendants should be used as a benchmark for this sentence. In other words, the judge didn't use any medical reasons to reject it. Well, I guess more importantly for us, the judge did say she'd read all the reports. She did. She considered the medical condition evidence, right? That's correct. And she read the same reports at the probation department. She praised the probation department for doing a great job. And they did. Now, there was no finding as to whether or not Mr. Watts should have been given a medical downward departure. Of course, she did. Of course, correct. Given a what? A downward medical departure is required by 3553. That's number one, a procedural error that the judge did not follow. She didn't make an explicit finding. She made an implicit finding, but it wasn't based upon any contrary medical evidence. Instead, the judge used co-defendant sentences as a benchmark for what Mr. Watts should be sentenced to. She used Mr. Isons, a co-defendant. Mr. Ison profited by a million three in his participation in the scheme. He was also a prior felony convict. He was sentenced to four years for a crime that was not clear in the PSR. Mr. Watts infested his entire $15 million in this oil venture initiated by his brother. He lost everything, everything. The second, and the judge was relying on this Ison 60-month sentence as a benchmark for the sentence for Mr. Watts. Then she used another benchmark sentence by Dominic Federosa. He was actually in the boiler room, and he was dealing directly with these investors and lying to them. He was motivated in his workplace by a quote from the movie Wolf of Wall Street. And that quote said, we'll pound the phone with a little bit of luck, we'll make lots of money, and we won't give an F-U-C-K. This was Dominic Federosa. She was comparing Dominic Federosa with Mr. Watts, okay? There was, in our opinion, no basis to use that Federosa sentencing as a benchmark for Mr. Watts' sentence. Mr. Watts was, even a juror recognized after the trial, a juror told a judge that we were impressed with Mr. Watts. He was firm in his conviction, although he was convicted beyond a reasonable doubt. The money damage that he caused was nothing compared to the co-defendants in this case. Even a prosecution witness testified that Mr. Watts was a straight shooter. So that Mr. Watts was in a different footing and standing, and it was wrong for the judge to rely on these co-defendant sentences to come to the conclusion that a 60-month sentence is appropriate in this case. That 60-month sentence wasn't based upon any medical evidence. It was based upon a letter that the Bureau of Prisons submitted. The government had the Bureau of Prisons submit this letter, and this letter said, we have all kinds of specialties in the federal system. We've got a federal medical center. We have, even those prisons that don't have a medical center, we have specialists available to us if necessary. Well, if this court decides to grant a re-hearing, we're going to prove that that letter is complete bunk. It's not worth the paper it's written on, because everything in that letter was not followed through. Let's demonstrate that at the re-sentencing hearing. And the judge relied on that letter, as opposed to any contrary medical evidence, to come to the conclusion that a 60-month sentence was. Now, he's been in prison for seven months. He has a heart monitor that it was surgically installed. It doesn't work. There's nobody to hear it, nobody to see it, nobody to read it. He hasn't seen a doctor except for ten minutes when he was admitted to the prison. And the prison has all the medical records that the Houston Medical Center gave to him. So for those reasons, I'm going to resume my argument for rebuttal. And trust your honors will appreciate the comments. Thank you, counsel. We'll hear from the government. Good morning, your honors. May it please the court, my name is Whitman Knapp. I'm an assistant United States attorney in the Eastern District of New York, and I represented the government in the district court. Michael Watts was found guilty of an array of financial fraud crimes. And the evidence proved that he paid in a legal boiler room to falsely inflate the market value of his family's company, and then later to dump his own shares of that failing company onto innocent, often elderly victims. Originally, as counsel informed the court, he was sentenced to a year and a day. He appealed the conviction. The government appealed the sentence. This court rejected the defense arguments, but agreed with the government that a year and a day had been too low. In March 2024, he was resentenced for his crimes to a 60-month term of imprisonment. That was 75% below the guideline estimate of 235 to 293 months. He was also ordered to pay restitution to the victims in the amount of more than $4.4 million. Despite all this, he argues that his 60-month sentence was unreasonable. Following remand and an advance of resentencing, probation prepared an update to its PSR. And in connection with that process, it interviewed Watts and it interviewed his wife. And they informed probation that Watts was in dire circumstances. But they did not provide a comprehensive set of medical records. Despite this, in October of 2023, probation issued an addendum and a recommendation that Mr. Watts receive a sentence of time served because of his health. Due to the gaps in the record, and because a reading of the record didn't suggest that Mr. Watts was being truthful, the government attempted to obtain a comprehensive set of records for Mr. Watts and didn't succeed in doing so. The government also did things such as search social media and other areas. And it actually learned through these means that Mr. Watts was not in the dire condition he'd represented. For example, the government found Facebook videos of Mr. Watts dated November 24th, 2023, showing him taking part in a lively family celebration, fully engaging with others, singing in precision close harmony with others, and standing behind a keyboard. This was just four days after the defense had recommended, had, excuse me, represented and submitted a letter to the court representing that Mr. Watts' condition was, quote, so precarious as to be life threatening. We also learned that Mr. Watts and his family had made untruthful representations about his wife's health, his daughter's health, and his granddaughter's health and well-being to both probation and the court throughout both sentencings. The government disclosed what it had uncovered for the first time in its February 2024 submission in advance of resentencing. This was approximately four months after the PSR update and the recommendation had been issued. This was information, and when I say information, the information that the government was providing in its sentencing letter that had not been available to probation when it made its sentencing recommendation four months earlier. In addition, in advance of sentencing, the government submitted all of the medical records that Mr. Watts had provided to probation to a medical doctor at the BOP for assessment. And that doctor determined that the Bureau of Prisons would be able to provide appropriate care to Mr. Watts were he to be sentenced to a term of imprisonment. At the resentencing hearing in March of 2024, the district court noted that it had taken Mr. Watts' medical condition into account in fashioning its sentence. It also outlined the specific reasons that the sentence was sufficient and no more than necessary, but also appropriate in light of all the 3553A factors. And that it was also, and this is an appropriate determination for the court to make, in line and appropriate with his 15 co-defendants' sentences as well. This 60-month sentence is not unreasonably high in light of the seriousness of Mr. Watts' conduct, in light of his ongoing total lack of remorse and unwillingness to acknowledge his criminal conduct, in light of his history of violations of securities laws, in light of his continuous attempts to mislead the district court and probation during his sentencing processes, and in light of the manifest need here for deterrence and just punishment. If the court has no questions, the government will rest on its brief. Thank you, counsel. Thank you, everyone. I would encourage the court to look at the podcast that the government referred to. It wasn't a lively, it was a sedate family function. That's all it was. Did Mr. Watts ever indicate in court to the judge any remorse for what happened? Any sympathy towards the victims? To the contrary. Is there anything in the record that could possibly establish some remorse on his part, or did he just fight this the whole way and say, I'm being abused and the government's being abusive and that kind of thing? He felt he was a victim. He felt he was a victim? He was a victim because there was an oil crisis. He didn't see any damage to others. He just saw the loss to himself. No, it was He lost money. He lost $15 million of his money because it was the oil crisis that occurred. And the price of the stock went down. The income from selling the oil went down. And they were bankrupt. That's why they went bankrupt. So he felt he was a victim. He lost more money than any victim in this case. So he didn't feel that he was due to be remorseful because he was a victim like the others. And Judge Seibert, in the first sentencing and the statement of reasons, makes it clear that his investment of $15 million, and I'm reading from the statement of reasons on the first sentence. This is Judge Seibert's read. His initial investment demonstrates that Hydrocar was a viable company prior to the 2014 crisis. And therefore, while a defendant is guilty of the charges for which he was convicted, his initial investment into a legitimate company mitigates in his favor for his subsequent crimes. Mr. Watts is a different defendant from these other stock convicted defendants. And that's the major difference in this case. Mr. Watts may have been a victim of circumstances that reduced his very large investment position to nothing. But he was not a victim like the victims, the other victims, of false statements, fraudulent representations to get them to buy worthless stock. He made what turned out to be a bad investment because of circumstances. And there may be plenty of reason to feel sorry for him, because he lost a fortune through what turned out to be a bad investment. But he was not the victim of frauds getting him to buy the stock, whereas the people who were the victims of his fraud were the victims of false statements. And they lost all their money too, or they lost a lot of money from people who couldn't afford it. There is no evidence, none, that Mr. Watts lied to any of these investors. That was done by these crooked guys in the boiler room. He relied on the boiler room. And- You relied on a boiler room? Yes. You're saying he didn't know what the boiler room was doing? Yes, because even the prosecution witness, Mr. Gleckman, testified a boiler room is a call center where you solicit investors to buy your stock. They had a newsletter. And that's what even the prosecution witness said. He thought it was a legitimate boiler room. And Mr. Watts thought it was a legitimate boiler room. But even Mr., the prosecution's witness who had pled guilty to a conflict of interest arising out of this, his involvement in this scheme. He testified that this was, in my opinion, this was a legitimate boiler room. And Mr. Watts was a straight shooter. This is the prosecution's witness. The problem is that that's an argument going to the merits, unrelated to the sentence. Well, it's also an argument- That means that he did not have criminal intent. Yes, and it also goes to the relatively culpability and disparity of sentencing between the co-defendants. Well, the jury discredited that he didn't know what was going on. The jury didn't accept that. The jury operated on the basis that he knew what was going on in the boiler room, and that was part of the fraud. He was found guilty of fraud. So maybe that- Now, we're past whether- The question is what sentence to impose. Correct, we're past whether the verdict was right or not. I understand that. This court has affirmed the verdict. So I'm not arguing that. What I'm telling you, what I'm trying to compress upon, Your Honor, is that Mr. Watts was in a different position than any of these co-defendants, and Judge Seibert refused to recognize that. But he was, am I correct, am I not, that he was found guilty of fraud, of participation in the fraud? Of the general conspiracy, yes. Of using washed trades. To commit fraud. Yes. And that was sustained on appeal. On a prior panel, that's correct. Are you telling us that there was no evidence of his being complicit in the frauds that were inflicted on the other victims? Well, I- It sounded as if you were saying he just, he was a victim of circumstances that reduced his investment to worthlessness. But he had no awareness that any fraudulent tactics were being used to unload his stock on the public. Well, that's a finding that we're confronted with. I can't change that, and I don't intend to change it. What I'm trying to impress upon your honors is that Judge Seibert mistreated, in the reasonableness calculation, comparing Mr. Watts' involvement with the Eisen and Verderosa. You did, on the first appeal, you did appeal from the finding that he participated in the fraud, right? Correct. And that was rejected. That's correct. This court found that there was evidence supporting his participation in the fraud. That is correct. I know it sounds like I'm arguing the first appeal, I'm not. I'm arguing how the distinction between treating Mr. Watts like the judge treated Mr. Eisen and the other co-defendants. because the evidence against them was in a far greater degree of guilt than Mr. Watts' involvement. Thank you, Mr. Ryan. Thank you very much. Thank you, Judge. I'll take the case under advisement. Thank you.